1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| M.S., | No. |
| Plaintiffs, | |
| v. | |
| Edmonds School District, a quasi-municipal corporation. | **COMPLAINT AND PETITION FOR REVIEW OF INDIVIDUALS WITH DISABILITIES EDUCATION ACT DUE PROCESS DECISION** |
| Defendant. | |

Plaintiffs bring this action to appeal the Findings of Fact, Conclusions of Law, and Final Order issued by Administrative Law Judge Jacqueline Becker on December 27, 2024, in a due process proceeding under the Individuals with Disabilities Education Act (IDEA). This appeal is made pursuant to 20 U.S.C. 1415(i)(2), which authorizes "any party aggrieved by the findings and decision" within a due process proceeding "to bring a civil action with respect to the complaint."

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

The underlying due process complaint challenged the Edmonds School District's decision to graduate and subsequently deny M.S. with the necessary access to a free appropriate public education, based solely on her achieving the necessary credits to graduate. The IDEA and Washington's laws implementing the IDEA require more than that before a student can be denied services. As such, under the appropriate burden, the District has failed to show that it complied with the requirements of the IDEA.

In reaching the opposite conclusion, the ALJ erred in four fundamental ways – concluding that M.S.'s education was "fully aligned with state standards" despite documented evidence she was only capable of working at an elementary school level and no evidence as to what those standards even are, or how her math and ELA class were aligned with those standards; concluding that M.S. no longer required special education services despite not meeting any of the goals on her most recent IEP; concluding that M.S. was adequately informed that the decision to graduate would terminate her services despite no evidence any information of the sort to relayed to M.S., and failing to consider whether Bellevue College's Occupational and Life Skills program is appropriate.

## I.    PARTIES

1.    Petitioner M.S. is a former student of Edmonds School District. M.S. was a student with a disability as that term is defined under the IDEA, and until the end of the 2021-2022 school year was eligible for special education and related services by the District.

2.    While attending high school between the 2018-2019 and 2021-2022 school years, M.S. resided with her mother and stepfather within the District's boundary. While currently attending Bellevue College, M.S. lives on campus but legally continues to reside at her family home.

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

3.     Edmonds School District is first class school district, a "*quasi*-municipal corporation," and an arm of the State of Washington. Edmonds receives federal funding under the IDEA. It maintains its headquarters and principal place of business in Snohomish County, Washington.

## II.     JURISDICTION AND VENUE

4.     This appeal of the Order arises under the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. §1400 et. seq.; 28 U.S.C. §§ 2201 and 2202; and the regulations promulgated thereunder. This Court possesses jurisdiction over the appeal pursuant to 20 U.S.C. § 1415(i)(2). Petitioners have exhausted their administrative remedies, and the Order on appeal constitutes a final agency action.

5.     All acts and omissions at issue occurred in the Western District of Washington. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b).

## III.     FACTUAL ALLEGATIONS

**FAPE Obligations under the IDEA and Washington's "Regular High School Diploma"**

6.     The Individuals with Disabilities Education Act (IDEA) requires all states which receive federal assistance under the IDEA to provide a "Free Appropriate Public Education" (FAPE) to students with disabilities until that student's twenty-second birthday. An exception applies, whereby a student's right to receive a FAPE terminates if they receive a "regular high school diploma."

7.     A "regular high school diploma" is defined as "the standard high school diploma awarded to the preponderance of students in the State that is fully aligned with State standards."

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

8.    During the hearing, a district representative testified that the Common Core State Standards for ELA are the "state standards" for purposes of English Language Arts classes. However the District failed[1] to introduce any evidence at the hearing regarding the contents of the "standards." While the Student had offered both the ELA and Math common core standards as exhibits, the District objected to their introduction at the start of the hearing.

9.    Washington State has adopted multiple ways to earn a high school diploma, which require completion of a certain number of credits, completion of a "high school and beyond plan," and completion of a "graduation pathway."

10.    But Washington has also has an additional step for students with IEPs to ensure the very acts at issue here do not occur. IEP teams are required to consider "whether the student continues to need special education services." Specifically, the Office of Superintendent of Public Instruction has clearly articulated that under Washington law, "students will receive a diploma when they complete their graduation requirements and the IEP team has determined that no additional special education services, including transition services are needed."

11.    The District's failure to consider whether M.S. continued to need special education services, as required by OSPI prior to graduation, denied M.S. a FAPE.

**M.S.'s Education**

12.    M.S. is currently twenty-one years old and has resided in the District at all relevant times. M.S. is nearly universally described as a delightful person, hardworking, kind, and curious.

---

[1] As identified *infra,* the District bore the burden of proof on this issue.

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

13.    M.S. also exhibits profound deficits in multiple educational areas, including in her ability to read, to write, to do math, and to conduct "activities of daily living." M.S. has been tested to have an IQ of 67.

14.    M.S. was first made eligible for special education in third grade, when she began receiving specially designed instruction (SDI) in Math and English Language Arts (ELA) through a District implemented Individualized Education Program (IEP).

15.    M.S.'s IEP followed her through high school, where she continued to receive SDI in Learning Strategies, Math, Reading, and Written Language.

16.    Come M.S.'s senior year (2021-2022 school year), she was on track to receive the necessary credits to graduate high school with a 3.87 GPA.

17.    However, M.S.'s progress on her IEP goals showed a different story. IEP goals document a student's "present level of performance," and provide a target the IEP team reasonably anticipates can be reached in a year for each area of need . For example, her writing goal placed her present level of performance at "writing a simple unsupported essay scored at a 2 out of 4" on the "The Edge Writing Rubric."[2]

18.    M.S.'s annual IEP meeting typically occurred in the fall.  Thus, M.S. has both a November 2020 IEP and an October 2021 IEP. Despite the general expectation that IEP goals will be completed in time for the following years IEP, *every single goal* from her November 2020 IEP had to be carried over to her October 2021 IEP, with the exact same "present level of performance" for each goal, thus confirming that M.S. did not make *any* progress on *any* IEP goal during her junior (and start of senior) year of high school.

---

[2] The lack of evidence produced in the hearing is one of the major issues identified below. For example, the District, which bore the burden of production and persuasion, did not produce a copy of what "the EDGE writing rubric" contains or requires.

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

19.    Despite the internal "present level of performance" remaining the same in each goal, other parts of her October 2021 IEP actually contained new present levels that showed significant *decline* in her abilities.  For example, a new line was added throughout M.S.'s IEP – "Currently, when given the i-Ready on-line assessment, [M.S.] reads at a 1st grade level." A second line was also added "[M.S.] scored at a sixth grade level on the Monroe testing." The District submitted no evidence explaining the huge gap between her GPA and her performance on her IEP goals and standardized testing, which measured her abilities in the elementary school range. Nor did anybody from the District ever try to identify the cause of that discrepancy .

20.    As explained throughout both her testimony and her mother's testimony, Plaintiff acknowledges that while she worked hard, she relied heavily on her peers, classroom paraeducators, and her mother to complete work. M.S.'s mother testified that when she would help M.S. complete assignments, M.S. would often have no idea how to do an assignment, and that her mother would have to walk her through every step, practically completing the assignment for her. M.S. further testified that although she can physically read, she very rarely understands what she is reading. During the hearing, M.S. was asked basic questions around dollars and cents and was unable to recall how many dimes, nickels, or quarters were in a dollar.

21.    M.S. was not held to the same standard as other students, as many adults in her life simply completed the assignments for her.

22.    The lack of progress continued during her senior year. In fact, progress reporting provided to M.S.'s parent showed that M.S. exhibited only "emerging skills," the lowest level of progress, on *every* goal identified in her October 2021 (which, again, were regurgitated word for word from her November 2020 IEP).

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

23.     Even worse, in official progress reporting provided to the Student, the District repeatedly stated "I-ready January Results indicate that [M.S.] has not acquired fundamental decoding skills and needs instruction in Phonics. Vocabulary is another cause for concern. This score indicates that the student has gaps in word knowledge *that also need to be addressed*." (emphasis added).

24.     But those gaps in word knowledge were not addressed.

25.     Instead, at the end of the 2021-2022 school year, M.S. was issued a high school diploma and cut off from access to special education. Specifically, on June 28, 2022 at 9:55 pm, the District issued a "Prior Written Notice" exiting her special education. That PWN contains *no* discussion of whether the IEP team "determined that no additional special education services, including transition services are needed."

26.     The evidence at hearing showed the exact opposite. Given M.S. profound deficits in math and ELA, which were tested to be well below grade level and at a minimum in the elementary school range, M.S. plainly continued to need access to specially designed instruction in those areas.

27.     At no point in M.S.'s entire high school career was she ever told about the implications of receiving the high school diploma, much less in a manner that she could understand and fully appreciate. Nobody from the district ever explained to her the possibility of accessing services until her twenty-first (now twenty-second) birthday.

**Post-High School**

28.     Following her exit from special education, M.S.'s mother tried to enroll her in various programs. Testimony at the hearing showed those programs were too academically rigorous for M.S., who was unable to complete the work.

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

29.    After being told there was nothing the District could do, M.S.'s mother was finally able to enroll M.S. in Bellevue College's Occupational and Life Skills (OLS) program in Fall of 2023. M.S. lost more than a year of education while her family looked for options like OLS.

30.    OLS describes itself as "an accredited degree program for adults with learning disabilities. In our uniquely supportive program, students learn to identify and develop a career pathway, grow interpersonal skills, build friendships, and gain marketable, workplace-ready skills. OLS creates a guided pathway for graduating students to become gainfully employed, contributing citizen."

31.    At the hearing, Jessica Salak, OLS's then interim associate dean, described the program and most importantly the success M.S. showed while attending the program – describing M.S. as a "great example of an OLS student."

32.    OLS is an appropriate placement for M.S.

33.    Because the ALJ found against the Plaintiff on every issue, she did not address whether OLS was appropriate for reimbursement. That was error.

**Legal Proceedings**

34.    On October 5, 2023, Plaintiff, through counsel, filed the underlying Due Process Hearing Request, alleging multiple violations of the IDEA.

35.    Following passage of Washington Senate Bill 5883 in June of 2024 (codified at Wash. Rev. Code 28A.155.260), the ALJ sought briefing on which party the burden of proof fell. On June 3, 2024, the ALJ issued an order clarifying that the District had the burden of proof for most of the issues, as required by Wash. Rev. Code 28A.155.260(1), except as to the appropriateness of OLS, consistent with Wash. Rev. Code 28A.155.260(2).

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

36.     Following a continuance of the hearing to allow the District additional time to prepare, the District was given an opportunity to develop new issue statements for the hearing. The District submitted those new issue statements on or about June 26, 2024. The ALJ incorporated the issue statements into an order on July 1, 2024.

37.     The issues for hearing were as follows:

a. Whether the District violated the substantive requirements of the Individuals with Disabilities Education Act (IDEA) and denied the Student a free appropriate public education (FAPE) by:

i.    Issuing the Student a "regular high school diploma," as defined by 34 C.F.R. §300.102(a)(3)(iv), in June 2022 and exiting her from special education services despite the Student's unique curriculum and education not being "fully aligned with State standards;" and

ii.    Issuing the Student a "regular high school diploma" in June 2022 and terminating her eligibility for special education services despite her ongoing need to access specially designed instruction.

b. Whether the District violated the procedural requirements of the IDEA and denied the Student a FAPE by:

i.    Failing to convene an individualized education program (IEP) team meeting between October 2021 and June 2022 to consider the results of a June 2021 evaluation by Dr.Lewis;

ii.    Failing to amend Student's IEP between October 2021 and June 2022 to address the Student's deficits in her adaptive/life skills; and Preventing meaningful student participation in the IEP process by predetermining in June 2022 that the Student would graduate with a "regular high school diploma" without convening an IEP team meeting and/or discussing the implications of receiving a "regular high school diploma" with the Student in a manner that the Student could understand.

c. And, whether the Parent is entitled to her requested remedies:

i.    Declaratory relief finding that the District violated the IDEA;

ii.    Declaratory relief finding that the Student was denied a FAPE by the District's actions and omissions;

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

iii.  Compensatory education in the form of reimbursement for the Student's enrollment at Bellevue College's OLS program, to allow the Student to obtain the educational benefit that she would have received but for the District's violations of the IDEA;

iv.  An order specifying the Student's stay put placement for all subsequent proceedings consistent with 34 C.F.R. §300.518(d); and

v.  Other equitable remedies, as appropriate.

38.  The Due Process Hearing was held September 3 and October 7-9, 2024.

39.  On December 27, 2024, ALJ Becker issued her Final Order, a copy of which is appended hereto.

## CAUSE OF ACTION

### ADMINISTRATIVE APPEAL
### PURSUANT TO 20 U.S.C. § 1415(i)(2)(A)

40.  The factual allegations set forth in the above paragraphs are incorporated by reference.

41.  The IDEA provides an appeal of the ALJ's decision as a matter of right. Specifically, 20 U.S.C. § 1415(i)(2)(A) states:

Any party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

42.  This right to appeal is also set forth in the Washington Administrative Code at Wash. Admin. Code § 392-172A-05115(1), which states:

Any party aggrieved by the findings and decision made under WAC 392-172A-05105 through 392-172A-05110 or 392-172A-05165 has the right to bring a civil action with respect to the

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

> due process hearing request. The action may be brought in any state court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

43. The Plaintiff brings this appeal pursuant to the above-stated provisions.

44. The Final Order includes factual findings that are not supported by the administrative record and legal conclusions that are unsupported, wrongfully determined, and misapplied. Throughout the Order, the ALJ makes unsubstantiated findings of facts and inferences that do not rationally follow from the available evidence. The Final Order likewise misapplied the burden of proof and impermissibly blamed Plaintiff for the lack of evidence.

### d. The ALJ Erred in Finding for Defendant Regarding Issue a(i)

45. The ALJ erred in concluding that the "the District met its burden to prove that the Student met the requirements to receive a regular high school diploma and did receive such a diploma."

46. The ALJ's factual findings are not supported by the evidence, given M.S.'s significant and documented delays in her reading and math abilities, which do not align with high school standards.

47. The ALJ's own findings concluded that she lacked sufficient evidence to properly analyze what the "state standards" even are, much less how to apply them. The lack of evidence should have been fatal to the defendant's claims, given it possessed the burden of proof. Instead, the ALJ blamed Plaintiff for the lack of evidence. That shifting of the burden of proof is reversable error.

48. The ALJ further erred regarding this issue by failing to hold the District to their own issue statement. The ALJ faults Plaintiff "to the extent the Student contends that the

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

District was required to go through each of the Student's courses for all four years of high school" stating "this contention is not well taken." However, that is precisely what the District's issue statement requires, as it contained no limiting language. The Defendant's failure to narrow its own proposed issue statement or seek discovery on which classes Plaintiff was concerned about, is not a basis for failing to apply the issue statement as written. The ALJ's implied conclusion to the contrary was error.

49.    The ALJ further erred by misstating Plaintiff's argument regarding this issue.

### b.  The ALJ Erred in Finding for Defendant Regarding Issue a(ii)

50.    The defendant denied Student a FAPE by prematurely exiting her from special education despite the continued need for the same, in violation of the IDEA and Washington's Office of Superintendent of Public Instruction (OSPI's) interpretations of its own graduation requirements.

51.    The ALJ's Order contained no analysis regarding OSPI's interpretation of its own graduation requirements, despite graduation requirements being a question of state law. The failure to consider the full range of requirements was legal error.

52.    The ALJ's conclusion that M.S. did not need ongoing specially designed instruction was legally erroneous. The undisputed evidence shows that M.S.'s IEP goals were simply carried over from the previous year, and after two years of "services" was exhibiting only "emerging skills" (the lowest level of progress) on those IEP goals. Even the evidence cited by the ALJ, including that M.S. was at best reading at a sixth-grade level (despite having a goal to read at the 10th grade level) reinforces, rather than diminishes, M.S.'s continued need for SDI. The ALJ's conclusions to the contrary were not supported by fact and legally erroneous.

### c.  The ALJ Erred in Finding for Defendant Regarding Issue b(iii)

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

53.     The IDEA requires school districts to fully involve students (once they turn eighteen), in all decision making. It further requires that information be provided to the student in a manner and means in which they can understand.

54.     Despite this clear mandate, at no time was M.S. involved in the decision-making process about her exit from special education. As the ALJ found "there was no discussion about the availability of age 18 to 21 transition services for the Student at this IEP meeting," that "Ms. Parent was not aware that graduating with a regular diploma would make the Student ineligible for transition services," and "a meeting to discuss exiting the Student from special education was not held."

55.     Despite this, the ALJ erroneously concluded "the evidence overwhelmingly demonstrates that the Student and Parent were aware that the Student was going to graduate in June of 2022 with a regular high school diploma." The ALJ's conclusion misstates Plaintiff's argument, namely that the District failed to properly inform Plaintiff, in a manner she could understand, that accepting a high school diploma would render her ineligible for participation IDEA transition services. The ALJ's subsequent conclusions of law regarding the same are error.

   **d. The ALJ erred in not determining the appropriateness of Bellevue College's OLS Program.**

56.     Because the ALJ ruled in the District's favor on all issues, it declined to rule on whether Bellevue College's Occupational and Life Skills program was an appropriate placement. Because each of the above identified legal conclusions were incorrectly decided, the ALJ likewise erred in concluding it did not need to address the appropriateness of OLS.

***

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

57.    If Plaintiff's appeal is successful, Plaintiff will be entitled to attorney's fees and costs for the matter that gives rise to this appeal as well as the appeal. Accordingly, pursuant to 20 U.S.C. § 1415(i)(3)(B), Plaintiff requests the Defendant be ordered to reimburse Plaintiff for all attorney's fees and costs accrued to as it relates to the underlying action that gives rise to this appeal and any matters related to this appeal.

58.    The Plaintiff  is aggrieved by the Order, are entitled to appeal that decision, and should, on appeal, be deemed the prevailing party.

59.    As prevailing party, the Parents are entitled to their reasonable attorneys' fees and costs.

### REQUEST FOR RELIEF

60.       Based on the foregoing, the Plaintiffs request:

A.  that the Court reverse the erroneous legal rulings contained in the Final Order;

B.  that the Court determine the District denied M.S. access to a Free Appropriate Public Education

C.  that the Court determine the OLS program at Bellevue College was an appropriate placement, and Oder the Defendant to reimburse M.S. for the same.

D.  that the Court awards Plaintiffs their recoverable costs and reasonable attorneys' fees incurred in the underlying special education due process action and in the instant appeal and any additional fees incurred in this action to prosecute and enforce their right to an award of attorneys' fee pursuant to 20 U.S.C. § 1415(i)(3)(B);

E.  that the Court remand to the Office of Administrative Hearings for further proceedings,

F.  and, as justice dictates, for the Court to grant any other relief deemed just or equitable.

CEDAR LAW PLLC
600 1st Ave., Ste 330, PMB 96563,
Seattle, WA, 98104
t. 206-607-8277 f. 206 237-9101

1

2  Dated: March 28, 2025.

3                                        Respectfully submitted,

4

5                                        CEDAR LAW PLLC

6
                                     By:    /s/ Alex Hagel
7                                           Alex Hagel, WSBA 55423
                                            alex@cedarlawpllc.com
8                                           600 1st Ave., Ste. 330, PMB 96563
                                            Seattle, WA 98104
9                                           Telephone: (206) 607-8277
                                            Facsimile: (206) 237-9101
10

11                                          *Attorney for Plaintiffs*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**WASHINGTON STATE**
**OFFICE OF ADMINISTRATIVE HEARINGS**

| | |
|---|---|
| In the matter of:<br><br>Edmonds School District | Docket No.    10-2023-OSPI-02067<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND FINAL ORDER**<br><br>Agency:        Office of Superintendent of<br>                    Public Instruction<br>Program:      Special Education<br>Cause No.    2023-SE-0173 |

A due process hearing was held before Administrative Law Judge (ALJ) Jacqueline Becker on October 7, 8, and 9, 2024, via zoom videoconference. The Parent of the Adult Student whose education is at issue[1] and the Adult Student (hereinafter "Student") appeared, and were represented by Lara Hruska and Alex Hagel, attorneys at law. Also present with Ms. Hruska and Mr. Hagel was Sierra Qualles, Rule 9 legal intern for Cedar Law. The Edmonds School District (District) was represented by Susan Winkelman, attorney at law. Also present for the District was Dr. Hayley Etnier, Director of Special Education.

<u>STATEMENT OF THE CASE</u>

**Procedural History**

The due process hearing request (Complaint) in this matter was filed on October 5, 2023. The matter was assigned to ALJ Becker. A prehearing conference was held on November 7, 2023, and the due process hearing was scheduled for March 26-28, 2024. On March 14, 2024, the parties jointly requested to strike the hearing date to pursue settlement efforts, and the request was granted. The parties did not reach a settlement, and the due process hearing was reset for June 10, 25 and 26, 2024.

On May 31, 2024, the District requested that the hearing be continued to provide the District with additional time to prepare given the enactment of the statute changing the burden of proof in this matter, RCW 28A.155.260. The request was granted and the due process hearing was reset for September 3, 4 and 9, 2024. The due process hearing was convened on September 3, 2024, but was continued due to the Parent being ill.

---

[1] To ensure confidentiality, names of parents and students are not used.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 1

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

The due process hearing was rescheduled for October 7-9, 2024, by order dated September 4, 2024. The hearing was held as scheduled.  Post-hearing briefs were timely submitted by the parties on December 2, 2024.[2]

**Due Date for Written Decision**

The due date for a written decision in this matter is January 1, 2025.

<u>EVIDENCE RELIED UPON</u>

**Exhibits Admitted:**

District's Exhibits: D1-D12, D14, D15, D16 (pages 1-7, 9, and 10 only), D17, D18, D19 (pages 1-5, 14, 15, 17 and 18 only), and D20.

Parent's Exhibits: P1, P3, P6, P11, P13-17, P19, and P20.

Court Exhibits: C1.[3]

**Witnesses Heard:**

Ms. Parent – Student's Mother

The Student

Megan Marlo-Nash – District special education teacher

Angelia Nivens – District school counselor

Katherine Gundesen – District general education teacher

Sharon White – District general education teacher

Stephanie Tastad – Former District college and career specialist

---

[2] The Student and her mother jointly petitioned for relief in this matter by filing a due process hearing request on October 5, 2023.  Their post-hearing brief is entitled "Student's Post-Hearing Brief." The ALJ interprets this brief to advance arguments on behalf of the Student as well as Ms. Parent.

[3] This exhibit was jointly submitted by the parties after the due process hearing ended in response to a question asked by the ALJ at the hearing.  Judicial notice is taken of this document which explains College Academic Distribution Requirements (CADRs).

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 2

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

Michael Denoma – District general education teacher

Shae Preuett – District special education teacher

Jean Kellogg – District general education teacher

Sara Lowes – Assistant Principal, Lynnwood High School

Jessica Salak – Interim Associate Dean, Occupational Life Skills program, Bellevue College

Dr. Gwen Lewis – Pediatric neuropsychologist

<u>ISSUES</u>

1.      The issues heard in the due process hearing are:

     a.      Whether the District violated the substantive requirements of the Individuals with Disabilities Education Act (IDEA) and denied the Student a free appropriate public education (FAPE) by:

          i.      Issuing the Student a "regular high school diploma," as defined by 34 C.F.R. §300.102(a)(3)(iv), in June 2022 and exiting her from special education services despite the Student's unique curriculum and education not being "fully aligned with State standards"; and

          ii.     Issuing the Student a "regular high school diploma" in June 2022 and terminating her eligibility for special education despite her ongoing need to access specially designed instruction (SDI).

     b.      Whether the District violated the procedural requirements of the IDEA and denied the Student FAPE by:

          i.      Failing to convene an individualized education program (IEP) team meeting between October 2021 and June 2022 to consider the results of a June 2021 evaluation by Dr. Lewis;

          ii.     Failing to amend the Student's IEP between October 2021 and June 2022 to address the Student's deficits in her adaptive/life skills; and

          iii.    Preventing meaningful Student participation in the IEP process by predetermining in June 2022 that the Student would graduate with

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 3

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

a "regular high school diploma" without convening an IEP team meeting and/or discussing the implications of receiving a "regular high school diploma" with the Student in a manner that the Student could understand.

c.     And, whether the Parent is entitled to her requested remedies:

    i.     Declaratory relief finding that the District violated the IDEA;

    ii.    Declaratory relief finding that the Student was denied a FAPE by the District's actions and omissions;

    iii.   Compensatory education in the form of reimbursement for the Student's enrollment at Bellevue College's OLC program, to allow the Student to obtain the educational benefit that she would have received but for the District's violations of the IDEA;

    iv.    An order specifying the Student's stay put placement for all subsequent proceedings consistent with 34 C.F.R. §300.518(d); and

    v.     Other equitable remedies, as appropriate.

## FINDINGS OF FACT

### Background

1.     The Student is currently twenty years old.  D11.[4]  She graduated from Lynwood High School in the District in June 2022, and attended school in the District at all times relevant to this action.  *Id.*

2.     A reevaluation of the Student was conducted by the District in November 2019. D2. The reevaluation summary states that the Student initially qualified for special education services in kindergarten.  She has attention deficit hyperactivity disorder (ADHD) and deficits in reading, writing, math, and learning strategies. *Id.* at 5-6.  In a reevaluation performed in November 2016, the Student qualified for special education

---

[4] Exhibits are cited by party ("P" for Parent; "D" for District), exhibit number, and page number. For example, a citation to P1 p.5 is to the Parent's Exhibit 1 at page 5. The hearing transcript is cited as "Tr." with references to the page of the cited testimony. For example, a citation to Tr. 80 refers to testimony at page 80 of the transcript.

services under the category of Other Health Impairment and qualified for services in reading, writing, math, and learning/organization skills.

3.      The November 2019 reevaluation report contains the following paragraph:

> Age Appropriate Transition:  [Student] plans to attend a 4-year college and then continue on into medical school.  While at LHS,[5] [Student] wants to take clay design and enroll in the Sno-Isle nursing program.[6]

D2 p.6.  The report also states that the Student would meet with a Division of Vocational Rehabilitation (DVR) representative and the disability representative from Edmonds Community College during her senior year.  *Id.* at  16.

4.      The reevaluation report states that "there are no concerns of executive functioning from [the Student's] general education teachers," and that "a review of state test scores suggest that [the Student] is still in need of specially designed instruction."  D2 pp. 10-11.

5.      According to the reevaluation report, the Student continued to demonstrate difficulty with starting and understanding the demands of a task and completing assignments independently.  The Student reported that she benefits from 1:1 support and does best when given the opportunity to ask clarifying questions in a small setting. D2 p. 12. However, her general education teachers' reports for the reevaluation noted that the Student is capable of completing assignments on her own. *Id.*

6.      The Student's scores on the Kaufman Test of Educational Achievement, Third Edition (KTEA-3), which was administered as part of the reevaluation, put her performance at the 4th percentile for reading comprehension, the 2nd percentile for math computation, and the 0.4th percentile for math concepts and applications. D2 p.15.

7.      An evaluation feedback meeting was held on November 5, 2019. D1.  The Student and her Parents[7] attended this meeting. D2 pp. 6, 19. Notes from the feedback

---

[5] This is a reference to Lynnwood High School.

[6] Sno-Isle is a technical school that offers classes in areas such as dental assistant and nursing assistant. Tr. 532.  Sno-Isle closed during the COVID-19 pandemic and the Student never attended it. *Id.* at 247.

[7] The Student's biological father passed away in 2018.  D2 p.9.  The family considers the Student's mother's partner to be the Student's stepfather.  The Student's mother and stepfather are together referred to herein as "Parents."

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 5

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

meeting show that the Student was found eligible for continued special education services under the category of Other Health Impairment. She continued to require services in reading, writing, math, and learning strategies/organization. D1. The feedback meeting notes state that the Student's general education teachers reported no concerns overall, and that her current accommodations were still appropriate. *Id*. The general education teachers noted the Student to be motivated and hardworking, and "a good student [who] is often engaged and on-task during class." *Id*.

8.      The feedback meeting notes also state that the Student's math performance was significantly below grade level, and she continued to require accommodations for reading and writing due to her executive functioning needs.  D1.

9.      An IEP was developed for the Student on November 5, 2020, during her junior year of high school. D3.  Ms. Parent participated in a meeting regarding this IEP on November 5, 2020.  *Id*. at 3.  The IEP called for the Student to receive 750 minutes per week of SDI in a special education setting from a special education teacher. *Id*. at 15.  This meant that 58.33% of the Student's time was spent in general education. The IEP also included four accommodations and eight modifications. *Id*. at 12. One of the modifications was a S/U (i.e., satisfactory /unsatisfactory)[8] grading option when determined appropriate by the IEP team for general and special education classes. *Id*. at 13.

10.     One of the Student's math goals in the November 2020 IEP was, "By 11/07/2021, when given Money counting task [sic] [Student] will be able to count accurately and give the right amount of change back, improving Money management skills of correctly counting and giving back change from 1 out of 10 transactions to 8 out of 10 transactions as measured By [sic] worksheets, formative classroom assessments, and teacher observation."  D3 at 8.

11.     The Age Appropriate Transition Assessment portion of the November 2020 IEP notes that consumer math is a difficult class for the Student, and money calculations are a stumbling block for her.  D3 at 8.

12.     The reading section of the Present Levels of Educational Performance portion of the IEP states that the Student scored at the ninth-grade level on the i-Ready[9] standardized test administered in October 2020. D3 p.7.

---

[8] Tr. 86.

[9] The i-Ready is an online test that is typically administered to special education students three times per year if they have reading SDI in their IEP.  Tr. 122, 287.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 6

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

13.     The cover page of the November 2020 IEP shows that the Student has a "projected graduation/exit date" of June 20, 2022. D3 p.3. The cover page states that the Student "is taking all required class [sic] and she is on track to graduate with the class of 2022." The Secondary Transition portion of the IEP states, "[Student] is an 11th grader at Lynnwood High School. She is taking all required class [sic] and she is on track to graduate with the class of 2022" in June 2022. *Id.* at 10. The Secondary Transition section of the IEP further states, "In addition to earning all graduation requirement credits, [Student] needs to pass all state and district required testing in order to graduate with the class of 2022." *Id.*

14.     Ms. Parent did not express any disagreement with the Student's projected "graduation/exit" date of June 2022 during the IEP meeting. Tr. 60. She also did not express any concerns about the Student's IEP goals. *Id.* Ms. Parent does not recall any discussion at the meeting about age 18 to 20 services, or whether the Student would have ongoing needs post-graduation that would qualify her for transition services. *Id.* at 246.

15.     The "State or Districtwide Assessments of Student Achievement" portion of the IEP states that the Student will take the State Smarter Balanced Assessment (SBA) individually or in a small group to reduce distractions, and will get extended time. This portion of the IEP further states that the Student qualifies for passing the SBA "under level 2 basic based on her abilities, needs, and SDI areas." D3 p.14. No evidence was presented at the due process hearing as to the meaning of "level 2 basic."

16.     On June 7, 2021, the Student received an email from the District explaining how to complete her required 11th grade tasks in "Naviance." Naviance is name of the state's High School and Beyond Plan, completion of which is a requirement for graduation. D20.

17.     During the latter half of the Student's junior year, when students in the District returned to in-person instruction post pandemic,[10] the Student had "massive breakdowns" at home a couple of times per week. Tr. 538. She would cry, say that she was dumb, say that she always needed help, and express frustration that her brain did not work like other children's brains. *Id.* at 538-39.

18.     The Student is athletic and made the school volleyball team during her junior year. However, she did not understand the game well enough to play on the team. The team's coach informed Ms. Parent that the Student could not grasp the rotations in the

---

[10] Ms. Parent is uncertain as to when the Student returned to school in person. Tr. 534.

various plays or the concept of the different positions. Tr. 534-36. So, she was made the manager of the team, and had responsibility for such things as retrieving stray balls. *Id.* There is no evidence that the Student's IEP team was made aware of this situation.

The June 2021 Neurodiagnostic Assessment

19.    In June 2021, the Student underwent a neurodiagnostic assessment by Dr. Gwen Lewis. P1. Dr. Lewis is a pediatric neuropsychologist. She has a master's degree in counselling and a Ph.D. in neuropsychology. Tr. 470-71. Dr. Lewis has experience working as a school psychologist in the District. *Id.*

20.    The purpose of the neurodiagnostic assessment was to determine if the Student would qualify for financial benefits from the state Developmental Disabilities Administration, as well as for federal Supplemental Security Income (SSI).  P1 p. 3. The Parents also wanted "to keep digging on trying to find out what [the Student's] diagnosis was" because they felt it was more severe than how the Student presented on the surface.  Tr. 243.

21.    Dr. Lewis gathered background information from the Parents, the Student, and her teachers.  Tr. 474. The background portion of the assessment report states, "[The Student] can memorize facts but if asked questions about the facts, her lack of comprehension is noticeable."  P1 p.1.  It states that she receives assistance from a para-professional, and that the Student "struggles meeting the academic demands of the curriculum" but receives A grades in spite of these struggles.  *Id.* at 1-2.  According to the report, "The support provided by the para-professional in her classes and the benefit she receives from group leaning has given [Student] the support she needs to receive the A grades."  *Id.* at 2.  This information came from the Parents as well as Dr. Lewis's inference that a child like the Student would be unable to get A grades without help.  Tr. 517.  However, according to Dr. Lewis, it was not a goal of the assessment to provide information about school performance.  *Id.* at 505.  Dr Lewis did not speak with anyone from the District about the Student and did not observe her at school or at home.  *Id.* at 507-08.

22.    Dr. Lewis's assessment testing was administered in one day and took approximately four to five hours.  Tr. 501.  Testing included administration of the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV). The Student's full-scale IQ was determined to be 67 which places her in the first percentile and is consistent with mild intellectual disability.  P1 pp. 3-4.

23.    Testing also included administration of the Woodcock-Johnson IV Tests of Academic Achievement.  The Student scored in the 42nd percentile for reading fluency

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 8

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

and in the fifth percentile for reading overall.  P1 p.8; Tr. 489.  The Student scored in the 0.1 percentile for mathematics, and the 34th percentile for written language.  P1 p.8.  According to Dr. Lewis, the Student was not able to understand the math questions.  She could remember how to do basic calculations such as addition, subtraction, and simple multiplication.  Tr. 490.  She was also able to remember how to spell words.  *Id.* at 491.

24.    Dr. Lewis assessed the Student's adaptive skills through the Adaptive Behavior Assessment System (ABAS) questionnaire filled out by Ms. Parent.    Tr. 493.  This placed the Student in the third percentile for communication.  P1 pp. 8-9; Tr. 494.  The ABAS was not given to any of the Student's teachers because, in Dr. Lewis's words, "it wasn't about a school evaluation."  Tr. 510.  The ABAS determined adaptive skills outside of a school setting.  *Id.* at 510, 522.

25.    Based on the neurodiagnostic assessment results, Dr. Lewis determined the Student has the following diagnoses:

>   Unspecified Neurodevelopment Disorder
>
>   Intellectual Disability, Mild
>
>   ADHD, Predominately Inattentive Type
>
>   Specific Learning Disorder with Impairment in Reading: Decoding, comprehension, and fluency
>
>   Specific Learning Disorder with Impairment in Written Language: Composition and fluency
>
>   Specific Learning Disorder with Impairment in Math: Problem solving, calculation, and fluency.

P1 p.11.

26.    Dr. Lewis opined at the due process hearing that the Student can memorize well and absorb information that is meaningful to her, but when she has to create a novel strategy for something unfamiliar, it is extremely difficult. Tr. 478-80.  The Student can learn concrete details, but when she has to organize and apply what she has learned to something new, that is hard for her.  *Id.* at 496-97.  Dr. Lewis also opined that the Student's life skills and adaptive abilities are low, but she presents as though she knows more than she is able to produce.  So, it could appear as though the Student might not need life skills and adaptive services.  *Id.* at 499.

27.     The "implications" section of the neurodiagnostic assessment concludes that the Student's cognitive disability impacts her ability to self-manage independently, and her approach to tasks impacts her ability to live independently without supervision. P1 p.9.

28.     The "Summary and Recommendations" section of Dr. Lewis's report goes on to state:

> During next year, her parents will have the opportunity of deciding whether or not [Student] would benefit from a special education program for students ages 18 to 21 within her school district. Often the programs for special education students ages 18 to 21 are designed to meet a student's need for more instruction to learn life skills. [Student's] special education eligibility would qualify her for continued services beyond her 12th grade in high school.

P1 p.10.  Dr. Lewis suggested the Parents consider checking on the availability of 18 to 21 services.  Tr. 498.  She told them it would be important to include goals in the Student's IEP focused on increasing the Student's life skills, such as following directions, understanding money, and navigating from place to place.  *Id.* at 500, 523.

29.     The Student did to not have dedicated one-to-one paraeducators working with her during high school.  Tr. 437.  However, she sought help from paraeducators frequently.  On one occasion, she called a paraeducator's personal cell phone to seek help with an English assignment.  *Id.* at 541.

The 2021-22 school year and the October 2021 IEP

30.     Shae Preuett[11] was the Student's case manager during her senior year.  After receiving Dr. Lewis's neurodiagnostic assessment report, Ms. Parent took a copy of it to Lynnwood High School.  Tr. 245.  She thinks she did this in the fall of 2021.  *Id.* at 572.  Ms. Parent informed Ms. Preuett that she was going to deliver the report to the school's front office.  She did so, and the school office staff person said they would put it in Ms. Preuett's mailbox.  *Id.* at 245, 550.

31.     On October 8, 2021, Ms. Preuett emailed Ms. Parent and stated, "It was nice talking to you today and I look forward to meeting with you and [Student] on Friday, October 22nd at 2:00 pm."  D4.  The email provided contact information for the

---

[11] Ms. Preuett has a bachelor's degree in social work and earned a master's degree in special education in 2024.  She has teaching endorsements in elementary education and special education. Tr. 282. Ms. Preuett has been a special education teacher for five years. *Id.* at 283.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 10

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

Student's school counselor, Angelia Nivens.[12]  The email went on to state, "I know that you would like to make sure that [Student] has an upcoming plan and that Mrs. Nakour your previous case manager suggested a program through Edmonds. Please forward any information that you think will be helpful in making the best plan presently and in the future for [Student]." *Id.*

32.    Ms. Pruett testified that she met the Student in person on more than one occasion.  She does not recall specific circumstances of meeting the Student. Tr. 318-19.  However, the Student is certain she never met Ms. Pruett in person. Tr. 442-43.  The Student is more credible on this point, and it is found that Ms. Pruett never met the Student.

33.    Ms. Nivens met with the Student at the beginning of the 2021-22 school year, as well as toward the end of the school year, to be sure she was on track to graduate. Tr. 150.  She recalls that the Student was excited about graduating, and they discussed the Student's post-graduation plan about becoming a sonogram technician. *Id.* at 151, 153.

34.    On October 1, 2021, the Student received an email from the Lynnwood High School counseling department recapping that counselors and the Career Center Specialist, Stephanie Tastad, had visited all senior English classes. D14 p.1. The purpose of the visits was to share the Pick Your Pathway (how to plan for post high school) resource handout, and a college application checklist. State testing requirements were also reviewed, and students were reminded to schedule their required senior meeting with their counselor. *Id.*

35.    Ms. Tastad recalls meeting with the Student a few times during her senior year to talk about graduation preparedness and the Student's plans after graduation.  Tr. 134.  She recalls meeting with the Student and her Parents, and they were excited about the Student attending Bellevue College. *Id.*

36.    On October 22, 2021, the Student's counselor, Angelia Nivens, sent an email to Ms. Parents and provided a link for accessing services at Edmonds College.  D15.

37.    Megan Marlo-Nash[13] was the Student's "academic lab" teacher during the 2021-22 school year. Academic lab is a class in which students receive help with their

---

[12] Ms. Nivens has a master's degree in school counseling and has been a school counselor since 2008. Tr. 149.

[13] Ms. Marlo-Nash has a bachelor's degree in sociology and has been a special education teacher since 2010.  She is currently working on a master's degree in special education.  She is the special education department chairperson at Lynnwood High School. Tr. 80-81.

other classes. The academic lab teachers pre-teach and post-teach information, help with assignments, and help with time management and organization. Tr. 81.

38.    Ms. Marlo-Nash provided input to the Student's IEP development in October 2021. She reported that the Student benefits from academic lab to help her with general education classes and that she actively seeks help when she does not understand something. D5. According to Ms. Marlo-Nash's input, "In the past, [Student] needed reminders about upcoming assignments/projects but at this time, she has not needed them." *Id.* Ms. Marlo-Nash recalls that the Student wanted to get straight A's during her senior year, she was a "very good student," and she was able to keep up in her classes. Tr. 82, 87-88.

39.    An IEP was developed for the Student in October 2021. Ms. Parent attended the IEP meeting on October 22, 2021. D6 p.3. Other attendees included Ms. Preuett, Ms. Marlo-Nash, Ms. Nivens, and Sara Lowes who was the Lynnwood High School assistant principal. *Id.* The cover page of the October 2021 IEP shows the Student's projected "graduation/exit" date of June 24, 2022. The cover page also states in a boldly bordered box, "[Student] is an [sic] 12th grader at Lynnwood High School. She is taking all required classes and she is on track to graduate with the class of 2022." *Id.*

40.    The October 2021 IEP states that the Student's disability "affects involvement and progress in general education." D6 p.5. The IEP indicates that the Student was reading at a first-grade level according to the i-Ready on-line reading assessment, but at a sixth-grade level on the Monroe testing. *Id.* Ms. Marlo-Nash reported that results from the i-Ready indicated that the Student had not acquired fundamental decoding skills and needed instruction in phonics, that vocabulary is "a cause for concern," and that the Student had gaps in word knowledge that also needed to be addressed. Tr. 91. However, the Student's general education English teacher reported that the Student was doing well in English, turned assignments in on time, and did a thorough job on them. D6 p.5.

41.    The Student's i-Ready score was not consistent with Ms. Marlo-Nash's observations of the Student's abilities or with her ninth-grade level performance in October 2020. The i-Ready is a lengthy assessment and Ms. Marlo-Nash has seen students become overwhelmed and "just start clicking buttons." In her experience, it is "very common" to see high school students get low reading scores on the i-Ready. Tr. 90-91. Ms. Pruett similarly opined that the i-Ready is not aways accurate and that is why she administers the Monroe test to some students. *Id.* at 291. The Monroe test is given on paper rather than on a computer and is shorter than the i-Ready. Tr. 287.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 12

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

42.    There is no mention of the neurodiagnostic assessment performed by Dr. Lewis in the October 2021 IEP. Ms. Parent thinks the assessment was discussed at the IEP meeting but does not remember what was said. Tr. 70. Ms. Parent recalls being told the assessment report would be added to the Student's IEP file. *Id.* at 70, 573. She did not ask for any changes to the IEP based on the results of Dr. Lewis's assessment. *Id.* at 70.

43.    Ms. Marlo-Nash does not recall ever seeing Dr. Lewis's assessment report. Tr. 99. Ms. Pruette does not recall whether she received Dr. Lewis's assessment report. *Id.* at 327-28. She does not recall any conversations about the Student undergoing a private evaluation. *Id.*

44.    The evidence as to whether Dr. Lewis's assessment report was ever received or discussed by the IEP team is conflicting. Ms. Parent recalls the report being discussed but cannot remember what was said. No one else remembers seeing or discussing the report and the IEP makes no mention of it. It is therefore found by a preponderance of the evidence that the report was not received by the IEP team, although the reasons for this are unclear.  Based on Ms. Parent's testimony, it is further found that the report was briefly discussed at the IEP meeting.

45.    The Student's general education social studies teacher provided input to the October 2021 IEP and reported that the Student did a great job presenting to the class about stereotypes, and also did a "senior quote presentation" in which she connected with the class by explaining about her identity.  D6 p.5.

46.    One of the Student's goals in the October 2021 IEP was, "By 10/26/2022, when given a graded (fiction/nonfiction) passage [Student] will silently read the passage improving reading comprehension from answering 8/10 questions correctly at 9.0 grade level to answering 8/10 questions correctly at 10th grade level as measured by reading assessment." D6 p.7. Thus, when this goal was developed, the Student was capable of correctly answering eight out of ten questions about a 9th grade level reading passage.

47.    Another of the goals focused on improving the Student's ability to write an essay from a score of two out of four to a score of three out of four as measured by the EDGE rubric.  D6 p.7.  While no additional evidence about this goal or the EDGE rubric was presented at the due process hearing, it can be inferred that the Student was capable of writing an essay that met at least some of the assessed criteria and she could score a two out of four.

48.    Another of the goals in the October 2021 IEP was a repeat of a math goal from the previous IEP with a change having been made only to the projected achievement

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 13

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

date: "By 10/26/2022, when given Money counting task [sic] [Student] will be able to count accurately and give the right amount of change back, improving Money management skills of correctly counting and giving back change from 1 out of 10 transactions to 8 out of 10 transactions as measured By worksheets, formative classroom assessments, and teacher observation." D6 p.7. The same typographical error and unusual use of capital letters exists in each version of the goal, indicating that it was cut and pasted from the previous IEP.

49.    Another of the goals in the October 2021 IEP pertains to math application and focuses on the Student designing surveys, interpreting data, creating graphs, and determining statistical values, thereby improving her "statistical skills" from 40% accuracy to 80% accuracy. D6 p.8.

50.    The Parent did not express any disagreement with the annual goals at the IEP meeting, although she noticed many were the same as the previous year. Tr. 63, 248. She thought the Student was on track to graduate even though she had "heavy support" from her learning strategies classes. *Id.* at 66. The Parent was unaware that she could dispute the projected graduation date. *Id*. at 248.

51.    The "Age Appropriate Transition Assessment" in the October 2021 IEP reads as follows:

**Age Appropriate Transition Assessment**

**Needs**

____ is a 12th grader at Lynnwood High School. She is taking all required classes and is scheduled to graduate in June 2022. ____ met with the vocational coordinator to talk about her goals and hopes for a future career. She is planning on going to a community college.

During her freshman year, ____ completed the Naviance Family Connection, a web-based Career and College Planning system designed to help high school students make informed decisions, and develop/pursue educational plans aligned to their career goals. ____ will also meet with DVR representative and the disability representative from Edmonds Community College during her senior year (Reported by Susan McNerney, Vocational Coordinator, student interview, October 12, 2021).

**Strengths**

____ is receiving specially designed instruction in reading, writing, math and learning strategies in order to make progress toward graduation. Math has always been the hardest class for her. This year she thinks she might need help getting her English work done, as there is a lot of work in this class. (Reported by Susan McNerney, Vocational Coordinator, student interview, October 12,2021).

**Preferences**

When asked about her learning preferences, ____ said she is a visual learner. She likes to work in a group where you can share ideas and information. She is a verbal communicator. (Reported by Susan McNerney, Vocational Coordinator, student interview, October 12,2021).

**Interests**

____ likes to spend her time practicing and hanging out with friends. She also enjoys painting and dance, especially hip hop. ____ has volunteered in the past and would like to volunteer again maybe at a pet shelter. She has chosen not to work and put all her work into school. After graduation she would like to go to Edmonds Community College, then transfer onto a four year university. She would like to go into the medical field in some way. She is leaning toward nursing.(Reported by Susan McNerney, Vocational Coordinator, student interview, October 12,2021)

D6 p.8 (Student's name redacted).

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 14

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

52.    The Student's secondary transition plan in the October 2021 IEP reads as follows:

**Secondary Transition**

Meeting Date:    10/22/2021

**PURPOSE:**   The purpose of transition planning is to develop a coordinated set of activities designed within a results-oriented process that is focused on improving the academic achievement and functional performance of the student in order to facilitate the student's movements from school to post-school activities, including postsecondary education, training, employment, and if appropriate, independent living skill.

Projected Graduation / Exit Date:06/24/2022
**Comments:**
▮▮▮ is an 12th grader at Lynnwood High School. She is taking all required class and she is on track to graduate with the class of 2022.

**I. Post Secondary Goals/Outcomes**
*Define and project the desired post-secondary goal as identified by the student, parent, and IEP team in the available content areas. Transition Services may be special education, if provided as specifically designed instruction or related services. These services would be included in the Service Matrix section of the IEP.*

| Content Area: Education/Training | |
|---|---|
| Upon leaving public school ▮▮▮ will ▮▮▮ will obtain a nursing assistant certificate from SnoIsle by the end of her senior year, and will work as a nurse assistant at a clinic or a hospital. | |
| **Transition Services** | **Staff / Agency Responsible** |
| Provide ▮▮▮ with training on how to apply for SnoIsle, check course requierments, and create a time management plan. | Teacher |

| Content Area: Employment | |
|---|---|
| Upon leaving public school ▮▮▮ will ▮▮▮ will work an a Nurse assistant upon graduating high school. | |
| **Transition Services** | **Staff / Agency Responsible** |
| Provide ▮▮▮ with training on how to apply for a job, create a resume, and go through a mock interview. | Teacher |

**II. Course of study**
*A multi-year description of coursework to achieve the student's desired post secondary goals, from the student's current year to anticipated exit year.*

▮▮▮ is an 11th grader at Lynnwood High School. She is taking all required classes and is scheduled to graduate in June 2022. ▮▮▮ met with the vocational coordinator to talk about her goals and hopes for a future career. ▮▮▮ wants to become a pediatrician and hopes to attend a four-year college after graduation. The Sno-Isle Tech programs in either nursing or medical assisting could be a good fit for her.

During her freshman year, ▮▮▮ completed the Naviance Family Connection, a web-based Career and College Planning system designed to help high school students make informed decisions, and develop/pursue educational plans aligned to their career goals. ▮▮▮ will also meet with DVR representative and the disability representative from Edmonds Community College during her senior year. (Reported by Susan McNerney, Vocational Coordinator, student interview, October 12, 2020).

Proposed Schedule for 12th grade:
LS English 12
Ethnic Studies
Student Store
Academic lab 12
Sno-Isle
Sno-Isle

In addition to earning all graduation requirement credits, ▮▮▮ needs to pass all state and district required testing in order to graduate with the class of 2022.
(Reported by Rana Nakkour, learning Support teacher, November 2020).

D6 p.9 (Student's name redacted). This is almost identical to the secondary transition plan in the November 2020 IEP, and erroneously states at one point that the Student is in 11th grade rather than 12th. D3 p.10.

53.    The October 2021 IEP service matrix is identical to the service matrix in the November 2020 IEP. It called for the Student to receive 750 minutes per week of SDI in a special education setting from a special education teacher. D6 p.15. This means that 58.33% of the Student's time was spent in general education. The IEP also included four accommodations and eight modifications. *Id.* at 11-12. One of the modifications was a S/U

(i.e., satisfactory/unsatisfactory) grading option when determined appropriate by the IEP team, for general and special education classes. *Id.* at 12.

54.    The IEP did not call for one-on-one support from a paraeducator, and the Student did not receive such support. Tr. 296.

55.    There was no discussion about the availability of age 18 to 21 transition services for the Student at this IEP meeting.  Ms. Parent was not aware that graduating with a regular diploma would make the Student ineligible for transition services.  Tr. 249.  Ms. Preuett does not recall having an explicit discussion with the Student to see if she understood that special education services would end when she graduated. *Id.* at 314.

56.    As of the time of the October 2021 IEP, the Student did not qualify for SDI in life skills.  Ms. Preuett did not think the Student needed life skills SDI because she was in the least restrictive setting, and was able to perform well in general education classes. Tr. 286

57.    A prior written notice (PWN) was issued on October 22, 2021, proposing to initiate the October 2021 IEP.  D6 p.17.  No additional IEP meetings were requested by the Parent or anyone else during the 2021-22 school year.  Tr. 297.

58.    On November 2, 2021, the Student received an email advising her about senior year tasks in Naviance.  D20 p.6.  The Student received several emails in November and December 2021 reminding her to complete Naviance tasks. She also received numerous reminders in the spring semester of 2022. *Id.* at 11-21.

59.    Michael Denoma[14] was the Student's art teacher in her Clay 1 class during her senior year.   Tr. 184.  The class is aligned with state standards.  *Id.*  The Student had anxiety about her ability to pass the class, but she finished all assignments and passed with a grade of C.  The Student was graded according to the same standards as other students in the class.  *Id.* at 185, 191.  Mr. Denoma does not recall the Student having any issues with manual dexterity or executive functioning. *Id.* at 192.

60.    Katherine Gundesen[15] teaches career and technical classes at Lynnwood High school. She had the Student in two general education classes during the Student's junior

---

[14] Mr. Denoma has an undergraduate degree in liberal arts and a graduate degree in fine arts.  He is certified to teach arts in Washington and has taught for 12 years at the high school level.  Tr. 183, 188-89.

[15] Ms. Gundesen has a degree in interdisciplinary childhood education, as well as a career and technical education certification.  She is a certificated teacher and has business marketing and family consumer science endorsements. She has been a high school teacher for five years. Tr. 197-198.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 16

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

and senior years – retail store management, and sales and advertising. Tr. 197-98; D11. Both classes are aligned to state standards and have dual credit through Bellevue college if a student gets a grade of B or better. Tr. 200.

61.    Students in the retail store management class run the school store and an apparel business.  Students do everything from making espresso drinks to cashiering, to managing orders and taking inventory.  Tr. 199.  Handling money is part of the class since students need to give correct change when cashiering.  Tr. 203.  Students also have to earn a food handler's permit online through the county health department, which requires passing an online test.  *Id.* at 203, 223-24.

62.    The sales and advertising class was during the Student's junior year and was held remotely due to the COVID-19 pandemic. There was a lot of group work in the class that year. If a student turned in all of their work and it was complete, they likely got an A in the class.  Grading was not as rigorous as it is when classes are in person. Tr. 217-19.

63.    The Student did well in both of Ms. Gundesen's classes and finished both with over 100% because she completed extra credit assignments.  Tr. 204. Ms. Gundesen recalls the Student doing very well and "being on top of her schoolwork." *Id.* at 204.  The Student asked for clarification when needed and was an advocate for herself.  The Student was graded according to the same standards as the other students in the classes and did not need to use any of her IEP accommodations.  Tr. 206.  Ms. Gundesen does not think there was a paraeducator present consistently in sales and advertising, but there was a paraeducator in retail stores who worked with all the students, assisting with such things as prep work and cashiering.  *Id.* at 210.  Ms. Gundesen had no concerns regarding the Student's performance in the classes.  *Id.* at 212.

64.    There was conflicting testimony about whether the Student ever worked as a cashier in the school store. Ms. Gundesen testified that the Student was hesitant about cashiering, which is not unusual. Significant instructional time is spent in the first three weeks of class regarding how to make change. Ms. Gunderson partners experienced student with newer students to allow them to practice cashiering skills. She recalls the Student needing extra practice before cashiering but that she was able to do it.  Ms. Gundesen was clear that she would not force a student to do something outside their comfort zone and conceded that she may be mistaken as to whether the Student actually worked as a cashier at the school store.  Tr. 205-06, 212-15, 221-22. The Student testified that she never worked as the store cashier because she was not comfortable working with money. *Id.* at 445.  The Student is more credible on this point. It is found that the Student received instruction in cashiering and was given the

opportunity to practice, but did not actually work as a cashier in the store. The Student recalls mostly making drinks and preparing food in that class. *Id.* at 445-46.

65.    At the due process hearing, the Student was able to identify that there are four quarters in a dollar. She does not know how much a quarter is worth. She knows that a dime is worth ten cents and a nickel is worth five cents. She does not know how many nickels, dimes or pennies are in a dollar. Tr. 446. The Student does not know how much change a person would receive if they used a twenty-dollar bill to pay for something that cost $14.50. *Id.* at 447.

66.    Sharon White[16] was the Student's "ethnic studies and diversity" teacher during her senior year. Tr. 230. This is a general education class that is equivalent to senior history. *Id.* It is aligned with state standards. *Id.* at 233-34. Grading is based on participation, writing assignments, quizzes, tests, and reflections on comprehension. *Id.* at 231. The Student was graded using the same criteria as other students in the class. *Id.* at 232. The Student received grades of A and B+. D11.

67.    Jean Kellogg[17] was the Student's lifetime sports and yogilates classes teacher during her senior year. Tr. 350-52. Both classes are aligned with state standards. *Id.* at 360. Ms. Kellogg recalls that the Student was "one of the most hardworking kids I've ever worked with. She is very persistent. She is very punctual. She was always prepared." *Id.* at 350. Ms. Kellogg recalls the Student would get anxious about classwork at times. She would talk with Ms. Kellogg about the assignment or relationships within class and "work it out," according to Ms. Kellogg. *Id.*

68.    Grades in Ms. Kellogg's classes are based on participation and written work. Tr. 352. In yogilates, assignments include teaching new yoga poses to other students and writing a "yoga story" using eight to twelve poses. *Id.* at 357. Ms. Kellogg did not modify assignments for the Student. The Student's yoga story was "exceptionally" good although it contained some run-on sentences. *Id.* at 353-58.

69.    The Student's twelfth grade English class was a general education class in which she received grades of A and B+. D11. The Student recalls that there was a lot of group work in the class. Tr. 369, 444.

---

[16] Ms. White has a master's degree in teaching and has been a teacher for 25 years  Tr. 229.

[17] Ms. Kellogg is a board-certified physical education and health teacher. She has been a teacher for 41 years. Tr. 349-50.

70.     Sara Lowes[18] has been an assistant principal at Lynnwood high school for twelve years.  Tr. 367.  Ms. Lowes attended the October 2021 IEP meeting and recalls that the Student was on track to graduate in June and no concerns were expressed about that plan.  *Id*. at 368.  According to Ms. Lowes, "There was nothing unusual or off track about this student's progress."  *Id.*

71.     On January 16, 2022, the Student emailed Ms. Marlo-Nash and stated that it was very important to her to get an A in Ms. Marlo-Nash's study skills lab class.  The Student asked how to get her grade up from an A-minus to an A.  D16.  Ms. Marlo-Nash then sent the Student some extra assignments worth five points each.  D16 p.2.  One such assignment was, "Research 10 things that organized people do and list them."  *Id.*  The Student also emailed Ms. Marlo-Nash on at least two other occasions in January 2022 to check on her grade in the class.  *Id.* at 7, 9.

72.     On January 18, 2022, the Student emailed Ms. Gundesen regarding the retail stores class, and stated she would be out of school for the rest of the week "until the virus calms down."  D16 p. 6.  The Student stated, "My grades are important to me and I want to make sure I am keeping up.  Please let me know what I need to do... Thank you."  *Id.*  Ms. Gunderson replied that the Student had a 119% in the class so any missed points that week would not affect her grade.  *Id.*

73.     Progress reporting on the Student's IEP goals as of January 28, 2022, showed that the Student demonstrated "emerging skills" on all of her IEP goals.  P3 p.1-3.  This meant that the goals might not be achieved within the duration of the IEP.  *Id.*

74.     On January 31, 2022, Ms. Preuett emailed Ms. Parent information about how to access and use "IEP Online Connect."  This portal allows parents to access draft and final evaluations, draft and final IEPs, and progress notes regarding their child.  D9.

75.     On February 23, 2022, the District sent the Student and her Parents a letter informing them that the DVR representative would be meeting with students on March 7, 2022.  Parents were invited to attend the meeting/presentation.  The letter stated that the presentation "will provide an overview of the programs that DVR can help students with after graduating."  D18 p.4.  The letter went on to state:

> DVR is a State and Federal-sponsored agency that assists people with disabilities in preparing for, obtaining and retaining employment.  Vocational rehabilitation programs are custom-designed for each

---

[18] Ms. Lowes has a bachelor's degree in history, and master's degrees in educational leadership and teaching English as a second language.  She is a licensed school administrator.  Tr. 366-67.

individual. You may also schedule an appointment with the representative where she will look closely at your child's educational plans in terms of job potential. Ms. Heerschap will then explain the purpose of DVR and will encourage your child to take advantage of this service that is offered. It will be your child's responsibility to pursue this service if they have the need."

The representative's contact information was provided. *Id.*

76.     On March 7, 2022, the District sent the Student an email with Ms. Heerschap's contact information. The email advised the Student to share the information with her Parents and not to delay setting up a meeting. D18 p.1. The email closed by stating, "Please contact her to set up a time to find out how they can help you to see what you qualify for. This is extremely important." *Id.*

77.     On March 30, 2024, the Student emailed Ms. Nivens and asked about completing a senior exit meeting and a senior exit form. She stated, "I would like to get these done so I will be able to graduate." D17 p. 2. Ms. Nivens responded that both would be done toward the end of the school year, and that the senior exit meeting could not be held until the final week of school because "this is how we clear students to graduate." *Id.* at 1. On June 6, 2022, the Student emailed Ms. Nivens and again asked to schedule her senior exit meeting. *Id.* at 4-5.

78.     In April 2022, the Student and Ms. Parent looked into enrolling the Student in the Pursuit Program at Edmonds College in order to access pre-employment transition services. The Pursuit Program serves students aged 16-21 who have a documented disability. Ms. Preuett completed the forms requested by Ms. Parent and sent them to Edmonds College. D19 pp. 1-2, 17. Students can participate in the program while they are still in high school, as an after-school activity. Tr. 137. The Student began the classes in the program on April 11, 2022. D19 p.16. She did not complete the program. Tr. 164. Ms. Parent felt that the program was "over the Student's head" and she was not getting any benefit from it. *Id.* at 166.

79.     On May 24, 2022, the Student received an email from the District reminding her to complete all Naviance tasks by May 31, and telling her that counselors would be checking off graduation requirements through senior exit meetings scheduled from June 6 through 10. D20 p.20. On June 9, 2020, the District sent the Student an email reminding all seniors to complete the Naviance tasks and explaining how graduation tickets would be distributed. *Id.* at 21.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 20

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

80.     Progress reporting on the Student's IEP goals as of June 23, 2022, showed that the Student continued to demonstrate "emerging skills" on all of her math applications and learning strategies/organizational skills goals. P3 pp. 1-3. No progress report was recorded for her reading and written language goals. *Id.*

81.     The Student wanted to graduate from high school, and it was her goal. Tr. 438. No one discussed a transition program or receiving age 18 to 21 services after high school with the Student. *Id.* at 441-42. The Student testified at the due process hearing that she did not understand she would be unable to access 18 to 21 services or transition services after getting her diploma. *Id.*

82.     The Student graduated from high school in June 2022. D11. She received a regular high school diploma, the same type issued to students without disabilities. Tr. 157. Ms. Marlo-Nash had no concerns about the Student graduating. Tr. 100.

83.     The Student's transcript does not indicate a specific graduation day. It specifies only June 2022. D11. The 2021-22 school year ended on June 24, 2022. D12.

84.     On or about June 28, 2022, Ms. Preuett sent out a meeting notice purporting to set a meeting at 9:55 p.m. on June 28, 2022. D10 p.1. Along with that notice was a PWN proposing to change the Student's eligibility for special education services to "ending special education services." *Id*. at 3. The reason given was that, based on a review of records, the Student had met all graduation requirements. The PWN states that "not ending special education services" was considered but rejected. The PWN also indicates that procedural safeguards had been given to the Student and family at the time of the last IEP meeting. *Id.* The PWN proposed to initiate ending special education services for the Student on June 28, 2022. *Id.*

85.     Ms. Pruette described this PWN as "talking about exiting [the Student] from the program after she is qualified to graduate based on what the counselors have given me." Tr. 309. Ms. Pruette stated:

> It is exiting her from high school. So the counselors have to give us an indication that the student is able to graduate and has met all the graduation requirements. So I probably completed this after school when I was going through making sure that all of the students were able –on target to graduate. And that's why it is probably indicating 10:00 at night because I was working in the evening.

Tr. 309.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 21

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

86.     A meeting to discuss exiting the Student from special education was not held. Tr. 310. In Ms. Marlo-Nash's experience, an IEP meeting is not held to end special education services when a student graduates from high school.  *Id.* at 106.

87.     The Student's final Washington State High School Transcript from Lynnwood High School lists the courses the Student took in high school and the grades she received.  D11.  Most of her grades were A's, with a few B's and one C.  She also received three grades of "P" which indicates "pass" and one grade of "W" which indicates withdrawal from the class.  Several of the Student's classes are marked as "T" which indicates dual credit tech prep.  The majority of her classes are also marked with "B" which indicates a "CADR" course, meaning the course met the Washington Student Achievement Council's "College Academic Distribution Requirements."  C1. Four of the Student's classes are marked with "Z" which means non-instructional, such as yogilates and personal finance.  D11.  Two classes are marked with "S" indicating a science lab, and two are marked with "C" which indicates "College in the HS."  *Id.*

88.     The Student had a 4.0 grade point average (GPA) in four of her eight high school semesters, and her cumulative GPA was 3.869.  D11.  She earned 24.75 credits.  The Student met the Washington State requirements for "high school and beyond plan,"[19] for "graduation pathway," and for Washington State history.  *Id.*  The Student's transcript shows a graduation date of June 2022, and indicates "grad requirements year 2022."  *Id.*

89.     Ms. Parent thought the Student got "heavy support" during high school and that "the paraeducators did the majority of her work."  Tr. 173.  Ms. Parent observed the Student to "not have a clue on what to do at home, how to start, [and] she relied heavily on her group members" in that her classes had a lot of group work.  According to Ms. Parent, the Student was unable to write essays on her own and the paraeducators helped her write essays and finish assignments.  Tr. 173.  Ms. Parent believes the Student needed 1:1 paraeducator support during all four years of high school, and she used the paraeducators in her various classes for this support.  *Id.* at 174-75, 541.

---

[19] According to the Graduation Pathways Toolkit for the class of 2022, published in August 2021 by the Office of Superintendent of Public Instruction (OSPI), all students must build a high school and beyond plan that shows how they will meet state and local graduation requirements and prepare for what they want to do following high school.  The plan starts no later than 8th grade and is revised annually by the student throughout high school to adjust for changing interests and goals.  P6 p.5.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 22

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

The Student's experience after graduating from high school

90.    After the Student graduated from Lynnwood High School, she worked part-time as an assistant summer camp counselor. Tr. 551. Ms. Parent attempted to get the Student enrolled in a program of some kind, but was unsuccessful. Ms. Parent contacted the District and OSPI looking for assistance, but she "could not get any further because [the Student] had a diploma in hand." *Id.* at 553.

91.    In March 2023, Ms. Parent contacted District staff members, including Ms. Lowes, because the Student was having difficulty getting accepted to Bellevue College. Tr. 370-73. Ms. Parent asserted to Ms. Lowes that the Student's IEP was not set up correctly during high school and the Student "fell through the cracks" due to disorganization. The Parent further asserted that the Student's transition goals were not measurable. Tr. 374-75.

92.    Since the fall of 2023, the Student has been enrolled in the Associate of Applied Science in Occupational and Life Skills (OLS) program at Bellevue College. Goals of the OLS program include preparing for the workforce, enhancing communication and social skills, and completing an internship. P11. The program focuses on communication, organization, time management, professionalism, self-advocacy, and developing skills for life and the workforce. *Id.*; Tr. 388.

93.    Each entering class or "cohort" at OLS contains 20-30 students. Tr. 392. The admission process is rigorous in that there are certain minimum qualifications, and applicants undergo an in-person assessment during which they participate in a classroom simulation and an interview. *Id.* at 419.

94.    The OLS program leads to an associate's degree in occupational and life skills. It is a four-year program, but students attend part-time. Tr. 388-89. Classes include such topics as nutrition, citizenship, communication, and health and fitness. *Id.* at 389-92. Students must have fourth-grade level reading and math skills, at a minimum, to enter the program. *Id.* at 394. Students do not receive letter grades in classes; they receive "credit" or "no credit." *Id.* at 398-99. Occasionally, students are placed in the OLS program by a school district as a transition placement. *Id.* at 408. In such cases, the District pays the tuition. *Id.* The current Interim Associate Dean of the program is aware of two such District-placed students. *Id.* at 420.

95.    The Student did not initially meet the minimum admission requirements for the OLS program because her IQ score was too low. However, when viewed holistically, the Student qualified and was admitted. Tr. 428, 555-56.

96.     The Student currently lives on campus with roommates in the supervised OLS housing program. She receives assistance with shopping, meal planning, personal hygiene, and organization. Tr. 179. OLS students are members of the campus community and can participate in clubs and student government. *Id.* at 393.

97.     Jessica Salak[20] is the Interim Associate Dean of the OLS program.  Tr. 386-88. She has worked with the Student in various roles.  Ms. Salak recalls the Student struggling with some executive functioning skills at the beginning of the program, but she has progressed and is able to advocate for herself.  *Id.* at 410.  Ms. Salak has observed the Student to be very independent on campus.  She comes to class on time, gets her work done on time, and gets great grades.  *Id*. at 416.  The Student has improved her ability to take care of herself and manage her time. *Id.*

98.     The Student loves the OLS program.  She is learning to grocery shop independently, and has learned about nutrition.  Tr. 447-50.  However, she does not cook from recipes because she does not understand the math involved. She is not able to take a bus or train independently and she feels unsafe going out into the community alone.  *Id.*  The Student will study money and math at OLS next year.  *Id.*  The Student plans to work with children at a preschool or elementary school when she graduates. *Id.* at 438.

99.     The Parents are concerned about the Student's safety and ability to live independently because she does not pick up on social cues, she cannot navigate public transportation, she is unable to drive, and she does not understand the concept of money. Tr. 255.  The Student also struggles with dexterity which makes cooking difficult.  *Id.* at 257.

100.    The Parents and Student are seeking $64,800 in reimbursement from the District as relief in this action. This is the amount they have borrowed to date for the first two years of the Student's OLS program at Bellevue College. This figure includes tuition, books, housing, food, and a bus card for transportation. Tr. 560-566. The Parents and Student also seek, in their post-hearing briefing, an order that OLS is the Student's placement going forward. Student's Post-Hearing Brief (Student's Brief) at 27.

---

[20] Ms. Salak has a bachelor's degree in secondary English education and a master's degree in special education.  Tr. 386.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 24

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

<u>CONCLUSIONS OF LAW</u>

**Jurisdiction and Burden of Proof**

1.      The Office of Administrative Hearings (OAH) has jurisdiction over the parties and subject matter of this action for the Superintendent of Public Instruction as authorized by 20 United States Code (USC) §1400 *et seq.*, the Individuals with Disabilities Education Act (IDEA), Chapter 28A.155 Revised Code of Washington (RCW), Chapter 34.05 RCW, Chapter 34.12 RCW, and the regulations promulgated under these provisions, including 34 Code of Federal Regulations (CFR) Part 300, and Chapter 392-172A Washington Administrative Code (WAC).

2.      The District bears the burden of proof as to most issues in this matter. RCW 28A.155.260(1). In a due process hearing, the burden of proof must be met by a preponderance of the evidence. RCW 28A.155.260(3). Because the Parent seeks reimbursement for a unilateral parental placement, the Parent bears the burden of proof as to the appropriateness of such placement. RCW 28A.155.260(2).[21]  See *Steadman v. SEC*, 450 U.S. 91, 102 (1981); *Thompson v. Dep't of Licensing*, 138 Wn.2d 783, 797 (1999); *Hardee v. Dep't of Social & Health Services*, 172 Wn.2d 1, 4 (2011*)*.

**The IDEA and FAPE**

3.      Under the IDEA, a school district must provide a free and appropriate public education (FAPE) to all eligible children. In doing so, a school district is not required to provide a "potential-maximizing" education, but rather a "basic floor of opportunity." *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 197 n.21, 200-201 (1982).

4.      In *Rowley*, the U.S. Supreme Court established both a procedural and a substantive test to evaluate a state's compliance with the IDEA. The first question is whether the state has complied with the procedures set forth in the IDEA. The second question is whether the IEP developed under these procedures is reasonably

---

[21] RCW 28A.155.260 provides:

(1) Except as provided in subsection (2) of this section, the school district has the burden of proof, including the burden of persuasion and production, whenever it is a party to a due process hearing regarding the identification, evaluation, reevaluation, classification, educational placement, disciplinary action, or provision of a free appropriate public education for a student with a disability.

(2) A parent or person in parental relation seeking tuition reimbursement for a unilateral parental placement has the burden of proof, including the burden of persuasion and production, on the appropriateness of such placement.

(3) The burden of proof in this section must be met by a preponderance of the evidence.

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 25

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

calculated to enable the child to receive educational benefits. "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Rowley*, 458 U.S. at 206-07.

5.      Procedural safeguards are essential under the IDEA, particularly those that protect the parent's right to be involved in the development of their child's educational plan. *Amanda J. v. Clark County Sch. Dist*., 267 F.3d 877, 882 (9th Cir. 2001). Procedural violations of the IDEA amount to a denial of FAPE and warrant a remedy only if they:

> (I) impeded the child's right to a free appropriate public education;
> (II) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or
> (III) caused a deprivation of educational benefits.

20 USC §1415(f)(3)(E)(ii); WAC 392-172A-05105(2); 34 CFR §300.513(a)(2).

6.      "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas County Sch. Dist. RE-1*, 580 U.S. 386, 399, 137 S. Ct. 988, 999 (2017). The determination as to whether an IEP is reasonably calculated to offer a student FAPE is a fact-specific inquiry. As the U.S. Supreme Court has made clear, "[a] focus on the particular child is at the core of the IDEA," and an IEP must meet a child's unique needs.  580 U.S. at 400. The "essential function of an IEP is to set out a plan for pursuing academic and functional advancement." *Id.* at 399. Accordingly, an IEP team is charged with developing a comprehensive plan that is "tailored to the unique needs of a particular child." *Id*. at 391.  Additionally, the Student's "educational program must be appropriately ambitious in light of his circumstances . . . ." *Id.* at 402.

7.      In reviewing an IEP, "the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.,* 580 U.S. at 399 (emphasis in original). The determination of reasonableness is made as of the time the IEP was developed. *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). An IEP is "a snapshot, not a retrospective." *Id.*

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 26

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

<u>Whether the District denied the Student FAPE by issuing her a "regular high school diploma" in June 2022 and exiting her from special education services</u>

8.    Under the IDEA, specifically 34 C.F.R § 300.102(a)(3), the obligation to make FAPE available to all children with disabilities does not apply with respect to the following:

> (i) Children with disabilities who have graduated from high school with a regular high school diploma.
>
> (ii) The exception in paragraph (a)(3)(i) of this section does not apply to children who have graduated from high school but have not been awarded a regular high school diploma.
>
> (iii) Graduation from high school with a regular high school diploma constitutes a change in placement, requiring written prior notice in accordance with § 300.503.
>
> (iv) As used in paragraphs (a)(3)(i) through (iii) of this section, the term *regular high school diploma* **means the standard high school diploma awarded to the preponderance of students in the State that is fully aligned with State standards**, or a higher diploma, except that a regular high school diploma shall not be aligned to the alternate academic achievement standards described in section 1111(b)(1)(E) of the ESEA.[22] A regular highs school diploma does not include a recognized equivalent of a diploma, such as a general equivalency diploma, certificate of completion, certificate of attendance, or similar lesser credential.

(Italics in original, emphasis in bold added.)

Washington's regulation pertaining to the provision of FAPE, WAC 392-172A-02000 provides, in part:

> (2) A student who is determined eligible for special education services shall remain eligible until one of the following occurs:
>
> ...
>
> (b) **The student has met high school graduation requirements established by the school district pursuant to rules of the state board of education,**

---

[22] "ESEA" refers to the Elementary and Secondary Education Act.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 27

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

**and the student has graduated from high school with a regular high school diploma.** A regular high school diploma does not include a certificate of high school completion, or a general educational development credential. Graduation from high school with a regular high school diploma constitutes a change in placement, requiring written prior notice in accordance with WAC 392-172A-05010.

(Emphasis in bold added.)

9.      Substantive standards for high school graduation are set by state law, not by the IDEA.  Guidance from the U.S. Department of Education, Office of Special Programs (OSEP), states that if a student meets the state's requirements for graduation, she cannot be denied a diploma on the basis of disability. *Letter to Anonymous*, 22 IDELR 456 (OSEP 1994).

10.     Washington's requirements for a high school diploma for the class of 2020 and later classes are spelled out in WAC 180-51-201.  They include state and local credit and subject area requirements aligned with the year the student entered high school, completion of a high school and beyond plan, and completion of a graduation pathway option.

11.     At issue in the present case is whether the Student met high school graduation requirements established by the District and whether she should have received a "regular high school diploma," i.e., the type of diploma that is awarded to the preponderance of students in Washington that is fully aligned with state standards. Resolving this issue requires examination of whether the Student's curriculum was aligned with Washington's state standards, whether she was held to the same standards as other students, whether her curriculum was modified, and/or whether she met the District's high school graduation requirements.  See *Sammons v. Polk Cnty. Sch. Bd*., 2005 U.S. Dist. LEXIS 45838 (M.D. Fla. Oct 7, 2005) (distinguishing curriculum modifications from the student's accommodations, finding that eliminating homework was not a modification of the curriculum, and that not requiring the student to write when he refused to do so was also not a modification of the curriculum*); Larkin v. Temecula Valley Unified Sch. Dist.*, 2018 LEXIS 227276 (C.D. Cal. June 12, 2018) (finding there was insufficient evidence to conclude that the Student's math curriculum was modified, or that she was permitted to use notes on exams when other student were not).

12.     The Student and Parent contend that the Student had a "unique curriculum" that was not fully aligned with state standards, and, consequently, she did not or should not have received a regular high school diploma. The Student and Parent further contend that the District did not meet its burden of proof on this issue because it failed to establish the content of the Washington State standards with which a

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 28

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

regular high school diploma needs to be aligned pursuant to 34 C.F.R § 300.102(a)(3)(iv). Student's Brief at 14-16. The Student and Parent argue that exhibit P9, the Common Core State Standards for Mathematics, and exhibit P10, the Common Core Standards for English Language Arts & Literacy, should have been admitted into the record. They argue that the inability to review the Common Core Standards leaves the tribunal "without any evidence as to what the standards actually are" and, consequently, the District "is unable to prove that Student's education was aligned with those standards." Student's Brief at 14-15.

13.    Notably, exhibit P9 was never offered into evidence through any witness or via judicial notice.[23] The portions of the transcript cited by the Student in her brief show that her attorney moved to admit only exhibit P10 through Ms. Lowes. Tr. 376. When the District objected to admission of P10, the following discussion occurred on the record:

> Ms. Winkelman: Well, we haven't had substantive testimony as to any of it and I don't know that we have any witness that is going to be able to give that testimony, so I don't believe that this witness can provide foundation for it by simply saying that a grade 12 class was aligned with state standards.

> Ms. Hruska: I have specific questions about standard alignment, but I'm just admitting the exhibit first because she identified what it was and that it was relevant to the English 12 class that has been discussed in some depth.

> ALJ: Well, she did identify the title page, I guess. What would be the date that these are – is there any sort on date on these, Ms. Hruska? I'm seeing a note in here of June 2nd, 2010 on Page 3, but how would I know if these are the current ones?

> Ms. Hruska: My understanding is these are the Common Core Standards that were in effect in 2021-2022 school year. They haven't changed since this was issued in 2010 per the introduction.

> Ms. Winkelman: But this witness can't – I mean has not confirmed that or that she is familiar with this specific document.

---

[23] At the commencement of the hearing, the District informed the ALJ on the record that it had no objection to Parent exhibits P3, P6 and P13. Those exhibits were admitted at that time, and the ALJ reiterated that all other proposed Parent exhibits would need to be offered into the record through testimony of a witness or some other method if the Parent wanted them to be considered. Tr. 39-42.

ALJ:  Yeah, I'm afraid I agree with that.  We would need someone familiar with this to date it and identify it more.  I mean, anyone can read the title here, but unless you can establish that this witness has enough familiarity to, you know, authenticate these and explain them a little bit more, I don't think she is the proper person to admit it through. So it won't be admitted for now anyway.

Ms. Hruska: Can I ask her questions about the ELA standards and whether she know if they apply to ELA at all?

ALJ:  Sure.  Why don't you ask and we will just sort of go question by question.

Tr. 376-77.  Thus, although the Student was given the opportunity to lay a more complete foundation for admission of exhibit P10 and offer it again, or offer it through another witness, she did not do so.

14.    Moreover, exhibits P9 and P 10 are a combined 159 pages of complex material related to educational standards for students in kindergarten through high school.  The Student was free to call an expert familiar with the Common Core Standards to authenticate them, date them, and interpret their contents for the tribunal. The Student was at liberty to have such an expert point out if and when the District's or the Student's curriculum did not align with state standards, but she did not do so.  Nor did the Student ask the ALJ to take judicial notice of the Common Core Standards, which the Student appears to now contend would have been appropriate.  Student's Brief at 15 n.2.  However, even if exhibits P9 and P 10 had been admitted, there is inadequate evidence in the record that would allow the ALJ to examine each of the Student's courses to see if they aligned with Common Core Standards. Moreover, the ALJ lacks the specialized knowledge and experience that would be required to analyze the content of the Student's curriculum.  *See Rowley*, 458 U.S. at 208 (cautioning that courts lack the specialized knowledge and expertise necessary to analyze educational practices and policies).

15.     To the extent the Student contends that the District was required to go through each of the Student's courses for all four years of high school and demonstrate that they were aligned with state standards, this contention is not well taken.  This would have been an oppressive and inordinately time-consuming undertaking that is not required in order for the District to meet the "preponderance of the evidence" standard in this case. The District made a showing through witnesses and the Student's transcript that the Student's curriculum was aligned with Washington's state

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 30

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

standards, that she was held to the same standards as other students, and that she met the District's high school graduation requirements.

16.    The Student and Parent's argument that the Student's curriculum was "modified" when she was not required to cashier at the school store in her retail store management class is not persuasive.  Cashiering was one of many skills that students learned in that class.  The Student received instruction in cashiering and was given the opportunity to practice with other students.  The fact that she was not forced to work as a cashier when she was not comfortable doing so might have affected her grade (although there is no evidence that it did), but it did not constitute a modification to the curriculum.  *See Sammons* at 31-35 (eliminating homework did not constitute a modification to the Student's curriculum; failing to require the student to produce written assignments on the occasions when he refused to do so did not constitute a modification to the curriculum).

17.    An overwhelming preponderance of the evidence shows that the Student met the District's and state's requirements to graduate from high school with a regular high school diploma, and that her curriculum was fully aligned with state standards.  The Student's IEP team confirmed in both the November 2020 and October 2021 IEPs that the Student was taking all required classes and was on track to graduate.  Her counselor reviewed the Student's progress toward graduation in the fall and spring of her senior year and ultimately determined that the Student had met all the District's requirements. Numerous teachers testified that the Student's classes were aligned with state standards and that she was graded in the same way as all other students. The high school's very experienced assistant principal confirmed that there was nothing unusual about the Student progression toward graduation. The majority of the Student's classes met college academic distribution requirements.  Notably, the transcript provisions cited by the Student to support the argument that she did not meet the requirements for receipt of a regular high school diploma *do not* demonstrate that her individual curriculum was modified in anyway.  Student's Post-Hearing Brief Student's Brief at 8.

18.    Moreover, the Student's argument that she was precluded from receiving a regular high school diploma because she did not make adequate progress on her IEP goals and could not make change for a dollar is also not persuasive.  In the words of the court in *Sammons*:

> [T]his Court does not interpret the IDEA to impose the additional requirement of progress on IEP goals and objectives on disabled students that is not imposed on non-disabled students in order to graduate with a regular high school diploma. The purpose of the IDEA is

> to open the doors of education to disabled students. If a disabled student
> legitimately earns the credits required to graduate with a regular diploma
> and satisfies any other state imposed graduation requirements, nothing
> more is required in order for the disabled student to graduate with a
> regular high school diploma.

*Sammons* at \*42. Moreover, there is no requirement that a student must be able to make change for a dollar in order to earn a regular high school diploma. While handling money may be an important life skill, the tribunal cannot substitute its own or a party's notion of sound educational policy for those of the school authorities. *Rowley*, 458 U.S. at 206.

19.     It is therefore concluded that the District has met its burden to prove that the Student met the requirements to receive a regular high school diploma and did receive such a diploma in June 2022. It is concluded that the District has proved the Student's curriculum was not "unique" or modified, and has proved that her curriculum was fully aligned with state standards.

<u>Whether the District denied the Student FAPE by issuing her a regular high school diploma in June 2022 and terminating her eligibility for special education despite her alleged ongoing need to access SDI</u>

20.     The Student's eligibility to receive special education services ended when she met the high school graduation requirements in June 2022 and graduated with a regular high school diploma.  The Student and Parent contend that the Student had an ongoing need for special education services, so terminating her eligibility by issuing her a regular high school diploma denied her FAPE.  There is scant evidence to support this assertion.  The District has shown that the Student earned excellent grades in high school, there were no concerns about her academic performance, and she met the graduation requirements for a regular high school diploma. Neither the Student, Ms. Parent, nor any of the teachers or staff at Lynnwood High School expressed concern about the Student graduating. She did not qualify for SDI in life skills and was not receiving such SDI in high school.  No one suggested that she should have been.

21.     Moreover, during her senior year, the Student no longer needed reminders about upcoming assignments and projects. She was able to ask for help when she needed it.  Monroe testing showed that the Student could read at a sixth-grade level, and i-Ready testing administered in 2020 showed she could read at a ninth-grade level. She could correctly answer eight out of ten reading comprehension questions pertaining to a ninth-grade reading passage.  The Student was capable of writing an essay that scored at least a two out of four on the EDGE writing rubric.  She could

Findings of Fact, Conclusions of Law, and Final Order
Cause No.  2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 32

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489
(800) 845-8830
(206) 587-5135

interpret surveys and graphs accurately 40% of the time and was working on improving that accuracy in her SDI.  Finally, the Student and her Parents were referred to DVR for assistance with programs that were available after graduation.

22.    It is therefore concluded that the District has met its burden to prove by a preponderance of the evidence that the Student did not have an ongoing need for special education services and SDI after graduation, and therefore she was not precluded from receiving a regular high school diploma.

<u>Whether the District violated the procedural requirements of the IDEA and denied the Student FAPE by failing to convene an IEP team meeting between October 2021 and June 2022 to consider the results of a June 2021 evaluation by Dr. Lewis</u>

23.    The IDEA requires that a school district review and revise a student's IEP periodically and not less than annually to determine if goals are being achieved.  WAC 392-172A-03110(3). The IDEA further requires that an IEP should be revised, as appropriate, to address lack of expected progress toward IEP goals, lack of expected progress in the general education curriculum, the results of any reevaluations, information provided by the parents as part of an evaluation or revaluation, the student's anticipated needs, or "other matters."  *Id.* at 3(b).

24.    The U.S. Department of Education has interpreted the IDEA to require IEP meetings, in addition to the yearly review meetings, as follows: [I]f either a parent or a public agency believes that a required component of the student's IEP should be changed, the public agency must conduct an IEP meeting if it believes that a change in the IEP may be necessary to ensure the provision of FAPE. 64 Fed. Reg. 12,476, Appendix A to 34 CFR Part 300 – Notice of Interpretation (March 12, 1999).

25.    In the present case, the Student and Parent contend that the District should have convened an IEP team meeting at some point between the development of the October 2021 IEP and the Student's graduation in June 2022 to consider Dr. Lewis's evaluation.  The evidence is undisputed that no one requested an IEP meeting at any point after the October 2021 IEP was developed.

26.    It has been found above that Dr. Lewis's evaluation report was not received by the IEP team. The evidence indicates that Dr. Lewis's evaluation was briefly discussed at the October 2021 IEP meeting, although Ms. Parent is the only person who recalls such a discussion. It is reasonable to infer that had Ms. Parent or anyone else on the IEP team believed that Dr. Lewis's report required additional consideration, or that the Student's IEP needed to be modified based on information that may have been

contained in the report, the report would have been addressed more substantively at the IEP meeting and at least mentioned in the IEP.

27.    Accordingly, the evidence is clear that neither Ms. Parent nor the District believed a change in the Student's IEP was necessary at any point after the October 2021 IEP meeting to ensure the provision of FAPE.

28.    The Parent and Student argue that WAC 392-172A-05005,[24] which pertains to independent educational evaluations (IEEs), mandates that the District was *required* to consider Dr. Lewis's evaluation when making decisions about providing FAPE to the Student. This argument is unsupported and erroneous.  The CFR implementing the IDEA defines the term "evaluation" as the "procedures used in accordance with §§300.304 through 300.311 to determine whether a child has a disability and *the nature and extent of the special education and related services that the child needs*." 34 CFR §300.15 (emphasis added). The state administrative rule similarly defines the term "evaluation" as "procedures used in accordance with WAC 392-172A-03005 through 392-172A-03080 to determine whether a student has a disability and *the nature and extent of the special education and related services that the student needs*." WAC 392-172A-01070 (emphasis added). The evidence is clear that Dr. Lewis's neurodiagnostic assessment was not an "evaluation" as defined by the IDEA because it did not determine the nature and extent of the special education and related services the Student may have needed.  WAC 392-172A-05005. Moreover, as Dr. Lewis herself made clear, the intent of the neurodiagnostic assessment was not to determine what the Student needed in school – it was to determine if she qualified for public benefits.

29.    For these reasons, it is concluded that the District proved by a preponderance of the evidence that the lack of an IEP meeting between October 2021 and the Student's graduation to consider Dr. Lewis's assessment did not constitute a violation of the IDEA or a denial of FAPE to the Student.

<u>Whether the District violated the procedural requirements of the IDEA and denied the Student FAPE by failing to amend the Student's IEP between October 2021 and June 2022 to address the Student's alleged deficits in adaptive/life skills</u>

30.    The Student and Parent contend that the Student's IEP should have been amended after October 2021 to address alleged deficits in her adaptive/life skills. As

---

[24] The Student's Brief erroneously identifies the relevant WAC provision as 392-172A-05001.  Student's Brief at 21.

set forth above, an IEP should be revised to address lack of expected progress, the student's anticipated needs, and "other matters," among other things. WAC 392-172A-03110(3)(b). As also set forth above, it is undisputed that no one requested an IEP meeting at any point after the October 2021 IEP was developed.

31.     SDI means adapting, as appropriate to the needs of an eligible student, the content, methodology, or delivery of instruction to address the student's unique needs that result from the student's disability and to ensure access of the student to the general education curriculum. WAC 392-172A-01175(c). There is little to no evidence that the Student had adaptive or life skills deficits in the school setting that needed to be addressed. She did not qualify for SDI in adaptive/life skills and Ms. Pruette did not see any indication that the Student needed SDI in that area. The Student was succeeding quite well in the general education curriculum with the SDI provided in her IEP, none of which was in the area of adaptive/life skills. Dr. Lewis's assessment of the Student's adaptive skills did not include any of the Student's teachers and it did not address school; it assessed the Student's adaptive skills outside the school setting.

32.     For these reasons, it is concluded that the District has proved by a preponderance of the evidence that the Student did not have adaptive/life skills deficits in the school setting that needed to be addressed. Therefore, failure to amend the Student's IEP between October 2021 and the Student's graduation to address her adaptive/life skills did not constitute a violation of the IDEA and/or a denial of FAPE.

<u>Whether the District violated the procedural requirements of the IDEA and denied the Student FAPE by preventing meaningful Student participation in the IEP process by predetermining in June 2022 that the Student would graduate with a "regular high school diploma" without convening an IEP team meeting and/or discussing the implications of receiving a regular high school diploma with the Student in a manner she could understand</u>

33.     "[P]redetermination occurs when an educational agency has made its determination prior to the IEP meeting, including when it presents one placement option at the meeting and is unwilling to consider other alternatives." *H.B. v. Las Virgenes Unified Sch. Dist.*, 239 F. App'x 342, 344 (9th Cir. 2002). Predetermination of a student's placement is a procedural violation that can deprive a student of FAPE. According to the U.S. Court of Appeals for the Ninth Circuit, a school district violates IDEA procedures "if it independently develops an IEP, without meaningful parental participation, and then simply presents the IEP to the parent for ratification." *Ms. S. v. Vashon Island Sch. Dist*., 337 F.3d 1115, 1131 (9th Cir. 2003).

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 35

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

34.     In the present case, the Student and Parent argue that the District predetermined the Student should graduate in June 2022 with a regular high school diploma.  They contend the District should have convened an additional IEP team meeting or otherwise discussed with the Student the implications of her receiving a regular high school diploma.  However, the IDEA does not require an IEP meeting to discuss, or determine the appropriateness of, a student receiving a regular high school diploma.

35.     Both the November 2020 and October 2021 IEPs clearly stated that the Student was on track to graduate in June 2022.  They noted that the Student would "exit" at that time, thereby documenting that special education services would discontinue with the Student's graduation. The IEPs extensively addressed the courses the Student was taking and what she needed to do to complete graduation requirements. Ms. Parent participated in discussions about the Student's progress toward graduation at the IEP meetings, and testified that she knew the Student was on track to graduate. The evidence does not support a contention that the District predetermined that the Student would graduate with a regular high school diploma; rather, the evidence demonstrates that the Student's status vis a vis graduation was a major topic of discussion by the IEP team during at least two meetings.

36.     The evidence overwhelmingly demonstrates that the Student and Parent were aware that the Student was going to graduate in June 2022 with a regular high school diploma, and they worked with the District to achieve that goal. If they had concerns about the plan, they could have raised them at any time over the course of the Student's junior and senior years, but they did not do so. The Student participated in numerous activities required by Naviance in order to graduate.  She discussed her post-graduation plans with Ms. Nivens and Ms. Tastad on several occasions.  She was excited about graduating and worked very hard to do so.  The Student and her Parents were invited to meet with DVR to discuss assistance they could receive after her graduation. They knew the Student needed a plan after graduation, and they took it upon themselves to enroll her in the Pursuit Program.

37.     Moreover, Dr. Lewis advised the Parent in June 2021, a year before the Student graduated, to look into 18 to 21 special education services for the Student.  There is no evidence that the Parent made any effort to inquire about 18 to 21 services, or that she or the Student were interested in exploring such services.

38.     For these reasons, it is concluded that the District met its burden to prove that it did not predetermine that the Student would graduate with a regular high school diploma.  The District has also met its burden to show that the Parent and Student were adequately informed about the plan for the Student to graduate with a regular

high school diploma, and that the awarding of the diploma did not deny the Student FAPE or otherwise violate the IDEA.

<u>ORDER</u>

The District has proven by a preponderance of the evidence that the Student met the requirements for a regular high school diploma and was appropriately exited from special education services when she graduated from high school in June 2022. The District has also proven by a preponderance of the evidence that it did not violate the procedural requirements of the IDEA or otherwise deny the Student FAPE.

Accordingly, the Student's and Parent's requests for relief are DENIED.

Because the Student and Parent are not entitled to any relief, the tribunal does not reach the issue of whether Bellevue College's OLS program is an appropriate placement for the Student.

SERVED on the date of mailing.

_____
Jacqueline Becker
Administrative Law Judge
Office of Administrative Hearings

## Right To Bring A Civil Action Under The IDEA

Pursuant to 20 U.S.C. 1415(i)(2), any party aggrieved by this final decision may appeal by filing a civil action in a state superior court or federal district court of the United States. The civil action must be brought within ninety days after the ALJ has mailed the final decision to the parties. The civil action must be filed and served upon all parties of record in the manner prescribed by the applicable local state or federal rules of civil procedure. A copy of the civil action must be provided to OSPI, Legal Services, PO Box 47200, Olympia, WA 98504-7200. To request the administrative record, contact OSPI at appeals@k12.wa.us.

Findings of Fact, Conclusions of Law, and Final Order
Cause No. 2023-SE-0173
Docket No. 10-2023-OSPI-02067
8612 - OSPI
Page 38

Office of Administrative Hearings
P.O. Box 42489
Olympia, WA 98504-2489
(800) 845-8830
(206) 587-5135

DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the State of Washington that true copies of this document were served upon the following as indicated:

Parent/Adult Student                          via E-mail
18502 46th Pl. SW                             ddmchugh6@gmail.com
Lynwood, WA  98037


Alexander Hagel                               via E-mail
Lara Hruska                                   alex@cedarlawpllc.com
Cedar Law PLLC                                lara@cedarlawpllc.com
113 Cherry Street                             emma@cedarlawpllc.com
PMB 96563
Seattle, WA  98104-2205


Jon Bell                                      via E-mail
Dr. Hayley Etnier                             bellj802@edmonds.wednet.edu
Edmonds School District                       geaslend338@edmonds.wednet.edu
20420 68th Avenue West
Lynnwood, WA  98036


Susan Winkelman                               via E-mail
Pacifica Law Group LLP                        susan.winkelman@pacificalawgroup.com
1191 Second Avenue, Suite 2000                grace.mcdonough@pacificalawgroup.com
Seattle, WA  98101


Dated December 27, 2024, at Olympia, Washington.

*Lan Le*

_____
Representative
Office of Administrative Hearings
P.O. Box 42489
Olympia, WA  98504-2489


cc:      Administrative Resource Services, OSPI